THOMAS McCARGO *v.* THE MERCHANTS INSURANCE COMPANY OF NEW ORLEANS.

Where insurance has been effected on slaves shipped from one port to another, the insurers will not be liable where the usual and necessary precaution in providing irons, and in maintaining security, or in the relative numbers of the whites and slaves have not been observed. In such case, the party is left to his recourse against the owners of the vessel.

The seaworthiness of a vessel on whose cargo insurance has been effected, is a condition precedent; and, if not seaworthy at the time of sailing, the policy will not be considered as having ever attached.

An insurance of slaves protects the insured against any loss arising from their mutiny and insurrection, unless that peril be expressly excepted or warranted against. The articles of the Civil Code rendering the owners of slaves liable for their offences and quasi-offences (C. C. 2300, &c.), do not apply to such a case, which is governed wholly by the commercial law.

Where insurance was made on the cargo of a vessel from one port to another, the the policy will attach though the cargo was put on board at another place than that named as the port from which the vessel was to sail, where it is the usage for vessels sailing from the port named, to take in their cargoes at the place at which it was actually received on board.

APPEAL from the Commercial Court of New Orleans, *Watts,* J. This was an action to recover $15,200, the insurance upon nineteen slaves, at and from Norfolk to New Orleans, shipped on the brig Creole on the same voyage as those insured in the case of the same plaintiff against the New Orleans Insurance Company, just decided. The policy stipulates that the defendants take upon themselves the risks of " takings at sea, arrests, restraints and detentions of all kings, princes or people of what nation, condition or quality soever, barratry of the master and mariners, and all other perils, losses, or misfortunes that have or shall come to the hurt, detriment, or damage of the said goods and merchandize or any part thereof." Appended to this policy is a memorandum, " that the Company are not liable for suicide, desertion or natural death, but that it provides chiefly for the risk of detention, capture, seizure of foreign powers." The evidence established the same facts as were proved in the plaintiff's action against the New Orleans Insurance Company. There was a verdict in favor of the plaintiff for $14,400, a deduction of $800 having been made for one of the slaves who had reached New Orleans on the brig.

*Peyton, I. W. Smith* and *Eustis,* for the plaintiff.

*F. B. Conrad, T. Slidell* and *Benjamin,* for the appellants.

BULLARD, J. This is an action on a policy of insurance upon nineteen slaves, valued at $800 each, at and from Norfolk to New Orleans, on board the brig Creole. The defendants assumed all the usual risks, it being stipulated, however, that they should not be " liable for suicide, desertion, or natural death, but chiefly for the risk of detention, capture and seizure of foreign powers." These slaves formed a part of the cargo of the Creole, and were totally lost in consequence of an insurrection or mutiny, as stated in the case of the plaintiff against the New Orleans Insurance Company, just decided.

The defendants, for answer, admit the signature of the policy, but deny all the other allegations in the petition. They deny that preliminary proof was duly furnished, and that the plaintiff has fulfilled the warranties which he was bound to fulfil.

There was a verdict and judgment in favor of the plaintiff, and the defendants appealed.

We have already expressed our opinion, that the loss was caused by the mutiny or insurrection, and, consequently, that the defendants are liable, unless they have made good some one of the grounds of defence upon which they rely.

It has been argued in this court, that the Creole was unseaworthy, and that, consequently, the plaintiff is not entitled to recover. The unseaworthiness is alleged to consist in neglecting those precautions and that vigilance which the safe transportation of slaves, naturally ready to avail themselves of every favorable chance to liberate themselves, requires ; and particularly in the want of arms on board, and the fact that the slaves must have themselves, brought on board concealed weapons, which they made use of in the revolt.

This question of seaworthiness was expressly left to the jury, and the charge of the judge is before us. That charge was as favorable to the insurers as they could have desired. The jury was instructed that, if they were of opinion that the usual, necessary and proper precautions in providing irons and maintaining security, or in the relative number of whites and slaves, were not observed, it would discharge the defendants, and leave the plaintiff to his recourse against the owners of the vessel. That seaworthiness was a condition precedent, and, if the vessel was not seaworthy when she sailed, the policy never attached, and the defendants are not liable. Under this charge, the jury, with all the evidence before them, found a verdict in favor of the plaintiff, and we are not prepared to say that, in this respect, there was any error.

This point is blended to a certain extent with another, which has been made in the argument in this court, and was also considered in the court below, to wit, that if the loss occurred in consequence of the mutiny or insurrection, it arose from the vices of character of the subject matter of the insurance, and consequently the defendants are not responsible ; that by the Civil Code of Louisiana, the master is himself responsible for the offences and quasi-offences of his slaves ; and that unless the underwriters *expressly* took upon themselves the risk of insurrection of the plaintiff's own slaves, the responsibility arising from such insurrection, and the consequent deviation would

rest upon the assured, in as much also as it is a well settled principle of the law of insurance; that where a loss arises from the inherent vices of the subject insured, the underwriters are not liable.

Upon these points the court below instructed the jury, that whatever may be the law of France in regard to the liability of insurers in a policy on slaves for the perils of mutiny and insurrection, we have adopted the English law, according to which an insurance on slaves protects the assured against losses arising from mutiny and insurrection, unless that peril be expressly excepted or warranted against; and further, that the articles of the Civil Code creating a liability on the owners of slaves for offences and quasi-offences, does not extend to this case, which is wholly governed by the commercial law.

The judge alluded, probably, to the same French authority which has been cited to us in support of this doctrine. It is a note by Estrangin, upon that part of the work of Pothier on Insurance, in which that author, in allusion to the doctrine that losses which arise from the inherent vice or quality of the subject matter of the insurance do not fall upon the insurers, concludes that when animals, or negroes die a natural death, or even when negroes, through despair, destroy themselves, the insurer is not liable; but that it would be otherwise if drowned in a tempest or killed in combat. Estrangin gives it as his opinion that the revolt or despair of negroes, resulting from the vice or character of the thing, ought in general to be at the risk of the insured; and he explains the decision stated by Emerigon of the Compte d'Estaing, by saying that the event was considered to be at the charge of the insurers, because the crew had become so weakened and reduced by contagious diseases that it could not resist the revolt, and the loss might be imputed to the disease, which was a sea risk; and he adds that, in the absence of peculiar circumstances to induce a different judgment, the revolt can only be attributed to the vice of the thing or the fault of the master. Pothier on Ins. 107, No. 66.

The commentary of Boulay Paty on Emerigon, seems to countenance the same doctrine. He remarks, that if the slave trade were not now prohibited by the laws of France, he would con-

.cur with Estrangin in the opinion, that losses occasioned by the ·revolt of slaves, as well as suicide through despair, ought to be · at the risk of the assured, both being attributable essentially to the same cause, and springing from the same motive, the desire inherent in the subject to escape from a state of slavery. 1 Emerigon, chap. 12, sec. 10.

These doctrines, although they are not those either of Pothier or Emerigon, even in relation to the African slave trade, would seem not unreasonable ; and if that traffic were not now treated as piratical, and no longer a legitimate object of insurance, might well be adopted as a proper rule. But the commerce ·between the States of this·Union in which slavery is tolerated, rests upon a different basis. It is very different from that trade which is now reprobated by the common voice of Christendom, ·by which the natives of Africa were reduced for the first time to a servile condition, and when their resistance might be regarded as any thing but criminal.

We are, therefore, of opinion, that the judge did not err in this instruction to the jury.

It has been further contended in this court, that the policy never attached ; that the Creole never was at Norfolk, one of the *termini* of the voyage, but that the slaves were taken on board in Hampton Roads.

This was not made a special matter of defence in the court below. If it had been we do not doubt but that it might have been shown to be an usage of that trade, for vessels to take in their cargo on a voyage from Norfolk at Hampton Roads. We infer this from the expressions of several witnesses, who speak of the Creole as having sailed from Norfolk, when in fact she sailed from Hampton Roads, which is rather an extension of the harbor of Norfolk. Upon this point, therefore, we think the verdict ought not to be disturbed.

Our opinion has already been expressed that the loss was occasioned by the insurrection, which, according to this policy was a risk assumed by the defendants, and, consequently, the .plaintiff is entitled to recover.

*Judgment affirmed.*

*(See opinion on application for a rehearing,* post, p. 349.)